FILED
CHARLOTTE, N. C.

SEP 2 9 2006

U. S. DISTRICT COURT
W. DIST. OF N. C.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| IN RE: REAL PROPERTY LOCATED AT ) <br> 11512 RIDGE OAK DRIVE, CHARLOTTE, ) <br> NORTH CAROLINA, AS MORE ) <br> PARTICULARLY DESCRIBED IN A DEED) <br> RECORDED AT BOOK 19526, PAGE 746, ) <br> IN THE MECKLENBURG COUNTY ) <br> PUBLIC REGISTRY ) <br> ———————————————————— ) <br> FILE IN GRANTOR INDEX UNDER: ) <br> **NEKEISHA N. O'CONNOR** ) <br> ———————————————————— ) | **ORDER** <br> **AND LIS PENDENS** <br><br> $3:06\,MC\,389-W$ |

WHEREAS, the United States of America, by and through Special Agent John Barron of the Drug Enforcement Administration, has presented an affidavit to the Court alleging that the above-captioned property was involved in or facilitated controlled substances trafficking and/or money laundering and/or was the proceeds of such criminal activity, in violation of 21 U.S.C. §801 et seq. and/or 18 U.S.C. §§1956-1957; and,

WHEREAS, the Court, having reviewed the affidavit, finds that there is probable cause to believe that the property was involved in or facilitated controlled substances trafficking and/or money laundering and/or was the proceeds of such criminal activity, in violation of 21 U.S.C. §801 et seq. and/or 18 U.S.C. §§1956-1957; and,

WHEREAS, upon this finding of probable cause, the property may be subject forfeiture to the United States pursuant to 18 U.S.C. §981 and/or 21 U.S.C. §881, and the government is entitled to record a lis pendens to give public notice of the government's forfeiture interest and potential civil and/or criminal forfeiture claim against the property;

THEREFORE, the United States is directed forthwith to file this Order and Lis Pendens with the appropriate state or local public depository to prevent the flight or transfer of the property so that the United States may initiate action to adjudicate forfeiture of the property; and,

ALL WHO READ THIS ORDER AND LIS PENDENS TAKE NOTICE that the property may be subject to forfeiture to the United States in a present or future criminal or civil in rem action before this Court, and any person who has a question as to this action should contact:

> United States Attorney
>     for the Western District of North Carolina
> Attn: William A. Brafford
> 227 West Trade Street, Suite 1650
> Charlotte, NC 28202
> (704) 344-6222

This the 29th day of September, 2006.

_____
UNITED STATES MAGISTRATE JUDGE

**TO THE RECORDER OF THIS INSTRUMENT: MAIL ANY AND ALL RECORDED COPIES TO THE UNITED STATES ATTORNEY FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT THE ABOVE ADDRESS.**

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Rodney Pierce, being duly sworn, deposes and says:

1.  I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.  Currently, I am a Task Force Officer for the Drug Enforcement Administration (DEA), United States Department of Justice.  I have been assigned to this position for approximately one (1) year three (3) months.  I have been a Monroe Police Officer for approximately twenty (20) years.  As a Monroe Police Officer, I was assigned as a patrol officer for nine (9) years; a Community Police Officer for five (5) years; an Administrative Officer for five (5) years; and a Vice and Narcotics Detective for one (1) year.  As a Vice and Narcotics Detective / Community Police Officer, I purchased controlled substances in an undercover capacity, obtained and executed search warrants, conducted interviews of suspects and utilized confidential informants to conduct investigations. As a police officer/ detective, I have attended various trainings on both the state and federal level and am knowledgeable regarding the Federal Drug Trafficking laws of Title 21, United States Code, Sections 841 (a) (1), 843 (b), 846, 848, 952 (a) and 963.

2.  Your affiant is conducting this investigation in conjunction with Drug Enforcement Administration, Special Agents Jon Shankweiler and John Barron who are assigned to the Springfield, Massachusetts Resident Office.

3. The information contained in this affidavit is based on my personal involvement in the investigation, information obtained by Special Agent's Jon Shankweiler and John Barron, my training and experience, my review of documents, surveillance, and conversation's intercepted by Special Agents Shankweiler and Barron over the Laprese GOLLMAN and Sarrail ARCHILLA authorized Title III cellular telephone intercepts, and information provided to me by other law enforcement officers. As such, this affidavit does not contain all the information I possess regarding this investigation, but only that which I believe is necessary to support the criminal complaint and search and seizure warrant applications.

4. This affidavit is in support of an application for search warrants for 11512 Ridge Oak Drive, Charlotte, North Carolina (hereafter referred to as TARGET LOCATION or TARGET RESIDENCE).  The residence is described in detail below:

- 11512 Ridge Oak Drive, Charlotte, North Carolina is described as a two story, single family residence with gray siding, maroon shutters and white trim.  There is an attached two car garage on the left side of the residence if looking at it from the street and a farmer's porch with white columns and trim on the front of the residence.  The number 11512 is clearly marked in dark numbers on the farmer's porch above the front entrance.

# PROBABLE CAUSE IN SUPPORT OF SEARCH WARRANT

## A.     Historical Information

5.  Over the past several years, Agents of the Springfield Resident Office have received information from numerous law enforcement officers and sources of information stating that Laprese GOLLMAN, a.k.a. Larese GOLLMAN, a.k.a. "Presey", is a multi-kilogram supplier of cocaine and crack cocaine to the Springfield, Massachusetts and Hartford, Connecticut areas. Several of these sources have stated that GOLLMAN distributes between twenty (20) and fifty (50) kilograms of cocaine per week to individuals in these areas.

6.  In December of 2003, during a debriefing of a registered DEA Confidential Informant (hereinafter referred to as CI3), CI3 stated that he/she had purchased 200 to 1000 gram quantities of cocaine from Juan PAGAN on twenty (20) to thirty (30) occasions and that he knew PAGAN'S source of supply to be GOLLMAN. CI3 further stated that he/she believed PAGAN received between ten (10) to fifteen (15) kilograms of cocaine per week from GOLLMAN. PAGAN is currently serving a twenty (20) year federal sentence for the possession with intent to distribute cocaine. CI3 disclosed that he/she had personally purchased cocaine from GOLLMAN on twenty (20) to thirty (30) occasions usually ranging from one hundred (100) to five hundred (500) grams per transaction. CI3 has provided reliable information to the Springfield Resident Office which has led to the arrest and conviction of at least three individuals in federal court and the seizure of wholesale quantities of cocaine.

7.  On February 24, 2005, DEA Agents seized approximately nine hundred (900) grams of cocaine during an arrest of an individual who later became a confidential informant (hereinafter referred to as CI4). CI4 stated that he/she had purchased two kilograms of cocaine from "Presey" (GOLLMAN) two days earlier and that he had purchased kilogram and multi-kilogram quantities of cocaine from GOLLMAN approximately fifty (50) to one hundred (100) times in the past. CI4 further stated, that the largest quantity of cocaine he/she had purchased from GOLLMAN at one time was five (5) kilograms and that this transaction took place in the summer of 2004. The information provided by CI4 has been corroborated by independent investigation and through several individuals who have made proffer statements. CI4 information has led to the arrest of one individual and the seizure of approximately 300 grams cocaine and two firearms.

8.  According to several confidential informants, GOLLMAN launders the proceeds of his cocaine trafficking through an automobile dealership he once owned (Advantage Auto Sales), a dealership he currently owns (GP Auto Sales) and through a Hartford, Connecticut night club that he co-owned ("Fuel"). "FUEL" has since been sold and sources of information state that GOLLMAN is currently looking into further business ventures in the Springfield, Massachusetts area. Sources also indicate that GOLLMAN owns residences in Springfield, Massachusetts, East Windsor, Connecticut

and North Carolina (TARGET RESIDENCE). TARGET RESIDENCE is in the name of Nekeisha OCONNOR (GOLLMAN'S wife and the mother of his child).

9. GOLLMAN has a criminal history to that includes convictions for possession with intent to distribute cocaine and possession of a controlled substance within school boundaries in September of 1999 and separate possession of cocaine charges in 1992 and 1993.

## B.    Current Investigation

10. On July 10, 2006, the Honorable Judge Tina Page, Springfield, MA Superior Court, signed an order authorizing the DEA Springfield Resident Office to intercept conversations overheard on Laprese GOLLMAN'S cellular telephone (413) 246-8517. Agents later applied for and were authorized an extension on the GOLLMAN telephone. Agents later applied for, and were granted permission by Judge Page to intercept a second cellular telephone being used by GOLLMAN (207-409-8624). Based on the interception of the target telephones, agents have learned GOLLMAN is purchasing multi-kilogram quantities of cocaine from several sources of supply and distributing it to approximately 10-20 customers in the Greater Springfield area.

11. Through interceptions overheard on GOLLMAN'S cellular telephones and physical surveillance, agents identified Sarrail ARCHILLA as GOLLMAN'S primary source of supply for cocaine. On August 17, 2006, agents applied for and were authorized permission to intercept two telephones being used by ARCHILLA (404-725-6153 and 409-497-7516).

12. On August 2, 2006, pursuant to intercepted calls over the GOLLMAN cellular telephones, agents observed Roddrick GANIOUS arrive at a residence known to be cocaine stash location/distribution point of the GOLLMAN organization. At that time, GOLLMAN and another individual, Elias MADERA, were present at the residence. After observing GANIOUS leave the residence later that evening, agents conducted a traffic stop of GANIOUS' vehicle. GANIOUS later fled from the scene of the stop and was arrested shortly after in possession of approximately 877 grams of cocaine. Numerous telephone calls intercepted after GANIOUS' arrest linked GOLLMAN and MADERA to the cocaine seizure.

13. On August 22, 2006, pursuant to intercepted calls over the GOLLMAN cellular telephones and the ARCHILLA cellular telephones, agents observed a meeting between GOLLMAN, ARCHILLA, MADERA and Lamar SAMUELS. Agents had intercepted calls indicting that SAMUELS was coming to Springfield, MA to pick up "one." Subsequent to this meeting, a vehicle stop of SAMUELS was conducted on the Massachusetts Turnpike heading east bound. Shortly after being stopped, SAMUELS fled from the scene and led police on a short, high-speed vehicle chase before yielding approximately (3) miles from the initial stop. SAMUELS was arrested and a search of his vehicle yielded negative results. Agents then searched the area between the initial

vehicle stop and SAMUELS' arrest location. This search revealed a black toiletry bag which contained approximately (1) kilogram of cocaine inside. The bag was located in some tall grass approximately 20 feet from the highway. SAMUELS later admitted to acquiring the kilogram in Springfield, MA and throwing it from his vehicle after fleeing.

14. Between August 20, 2006 and August 28, 2006, agents intercepted numerous calls over the GOLLMAN and ARCHILLA cellular telephones indicating that GOLLMAN and ARCHILLA would be traveling from the Springfield, MA area to North Carolina. GOLLMAN, who had his daughter in Springfield visiting from North Carolina, was driving his daughter to North Carolina for the start of the school year. ARCHILLA, who is believed to have a residence in Winston-Salem, was flying. Both men left the Springfield area on Thursday, August 24, 2006. Per intercepted calls, GOLLMAN transported $100,000.00 United States Currency to North Carolina for ARCHILLA who was to pick it up in North Carolina and deliver it to a courier. The courier would then bring the money to ARCHILLA'S cocaine source of supply, Brenda GOOD, in Houston, TX. Per intercepted telephone calls, GOLLMAN was to be residing at the TARGET RESIDENCE for his entire stay in North Carolina.

15. Pursuant to intercepted calls, GOLLMAN made the delivery to ARCHILLA on August 28, 2006, approximately (4) days after arriving in Charlotte. Calls revealed, however, that GOLLMAN only provided ARCHILLA with $90,000.00. Based upon these facts, your affiant has probable cause to believe that GOLLMAN secreted at least $90,000.00 of narcotics proceeds in the TARGET RESIDENCE between August 24, 2006 and August 28, 2006 and that GOLLMAN may still have an additional $10,000.00 secreted inside of the TARGET RESIDENCE.

16. On September 15, 2006, agents intercepted numerous pertinent conversations between GOLLMAN, Sarrail ARCHILLA and a third individual later identified as Willie PERRO. In substance, agents overheard that PERRO was en-route to Springfield, MA to meet with ARCHILLA and take possession of a substantial amount of money from ARCHILLA. ARCHILLA had collected the money in Springfield, MA after distributing 10 kilograms of cocaine. During the GOLLMAN and ARCHILLA investigation, PERRO has been identified as a money courier for ARCHILLA's Houston, Texas-based cocaine trafficking organization. GOLLMAN was also overheard attempting to collect money in order to pay off his cocaine debt to ARCHILLA and obtain more cocaine from ARCHILLA. At approximately 6:30pm, agents observed GOLLMAN meet with ARCHILLA at 71 Arden Street, Springfield, MA and travel around the city of Springfield, MA making several stops. It should be noted, as GOLLMAN was driving around with ARCHILLA as his passenger, ARCHILLA was being intercepted speaking to PERRO and giving PERRO directions to Springfield. ARCHILLA was also overheard asking PERRO if "he was dirty" to which PERRO replied "No, I just have some Chips". Your affiant believes based on his training and experience that ARCHILLA was asking PERRO if he had cocaine (dirty) in the vehicle to which PERRO replied "no just some money (chips)." All of these conversations took place in the presence of GOLLMAN. Agents later observed GOLLMAN and ARCHILLA traveling in tandem with a white van with TX license plates. Agents followed the van and GOLLMAN to 71 Arden Street

where GOLLMAN was observed dropping ARCHILLA off. GOLLMAN then departed the area. A short time later, agents observed ARCHILLA departing 71 Arden Street in with PERRO. Agents arrested ARCHILLA and PERRO and recovered approximately $150,000.00 United States Currency from PERRO's van. Agents have since executed several search warrants on ARCHILLA's Springfield, MA and Winston Salem, NC residences and have seized more than $250,000.00 in assets from ARCHILLA. On September 18, 2006, GOLLMAN was intercepted talking to Brenda GOOD, ARCHILLA's Houston, TX cocaine source of supply. During that conversation GOLLMAN and GOOD spoke in detail about ARCHILLA's September 15, 2006 arrest. In one part of the conversation, GOLLMAN asks GOOD if they (police) have warrants for everyone. Based on this conversation, Special Agent John Barron believes GOLLMAN thinks the police may be looking for him as well. Your affiant believes, through information gathered from Agent Barron, that GOLLMAN is asking GOOD about the warrants because he wants to know if he needs to leave town. Your affiant believes that if GOLLMAN leaves Springfield, MA he will travel to the TARGET RESIDENCE and may move any assets he has from the Springfield area to that residence as well. Your affiant also believes based on the information contained in paragraphs 14 and 15 above that GOLLMAN considers the TARGET RESIDENCE as a safe location to store his assets and any items he wants to secrete from law enforcement officers.

17. Agents of the Springfield Resident Office of the DEA have conducted preliminary property and records checks of the TARGET RESIDENCE. Through these checks, agents have learned that the TARGET RESIDENCE has a deed in the name of Nekeisha OCONNOR. Nekeisha OCONNOR is known to be the mother of GOLLMAN'S 10 year old daughter. Your affiant also knows through prior investigation and CI information that GOLLMAN has deeded a previous residence, 82 Joanne Street, Springfield, MA, in OCONNOR'S name. Intercepted telephone calls over the GOLLMAN cellular telephones indicate that GOLLMAN is depositing money in OCONNOR'S bank account in order for OCONNOR to pay the mortgage at the TARGET RESIDENCE. Registration checks of a Honda Accord seen parked in the driveway of the TARGET RESIDENCE reveal that the vehicle is registered to Nekeisha OCONNOR. Pen register data on Laprese GOLLMAN'S cellular telephones shows well over 3,000 calls between OCONNOR and GOLLMAN since December of 2005.

18. Through the debriefing of several confidential informants and approximately fourteen (14) months of independent investigation by the Springfield Resident Office, your affiant has learned through information provided by SA Barron and SA Shankweiler that GOLLMAN often hides narcotics and monies derived from the sale of narcotics in residences he puts in the names of female companions. Your affiant has learned that GOLLMAN utilized safes and safety deposit boxes to store such monies. In my training and experience, narcotics traffickers often keep ledgers and records of their illicit activities secreted in their residences.

19. Based on my training and experience and conversations with other law enforcement, your affiant knows the following to be true of those who distribute and possess narcotics:

a.      Narcotics trafficking generate large quantities of cash, which traffickers must store until it can be converted to other assets. Monies derived from narcotics trafficking are hidden in a number of ways, to include: safes, bank accounts, safe deposit boxes and hidden compartments located in residences and vehicles. Evidence of bank accounts is often found at the residences of distributors in the form of deposit slips and bank statements. Evidence of the existence of safe deposit boxes can be found through bank records, keys or records maintained by the trafficker. Proceeds derived from the sale of narcotics are commonly converted to jewelry, precious metals and coins which are often maintained at the distributor's residence. Traffickers commonly wire transfer money to pay suppliers and evidence of this is kept at their residences.

b.      Records and other notations indicative of narcotics trafficking are maintained by distributors. These records often indicate the identities of people to whom narcotics are bought and sold, amounts of money owed by customers and amounts owed to suppliers.

20.      Based on the foregoing information, my experience in narcotics investigations and on conversations with other law enforcement agents and officers, your affiant believes that evidence of the illegal possession and distribution of narcotics exists at the aforementioned locations, described more thoroughly above. I believe this evidence may include:

a.      Books, records, receipts, notes, ledgers, and other paper relating to the distribution of controlled substances.

b.      Cellular telephones, pagers, personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances.

c.      Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, for example: money orders, wire transfers, cashier checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as precious metals and gems such as gold, silver, diamonds, etc.

d.      Items of personal property that tend to identify the person in the residence, occupancy, control, or ownership of the premise that is the subject of this warrant, including, but not limited to: canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and phone bills, keys, and identification documents.

e.      Documents indicating travel in interstate and foreign commerce, to include: airline tickets, notes and travel itineraries; airline schedules; bills; charge card receipts; hotel, motel and car rental statements; correspondence with travel

agencies and other travel-related businesses, airline, rent-a-car, and hotel frequent flier or user cards and statements; passports and visas; photographs of foreign locations; and papers relating to domestic and international travel.

21.     Your affiant also request that these search warrants authorize agents to open and search any safes or lock boxes located within the residences described above. In my training and experience, it is common for narcotics traffickers to secrete narcotics and the proceeds generated from the sales of narcotics in safes and lock boxes located within their residences or stash locations.

22.     Based upon the foregoing facts, which are true and accurate to the best of my knowledge, information and belief and based upon my training and experience, I believe there is probable cause to state the following. (1) Laprese GOLLMAN has committed violations of 21 U.S.C. 841(a)(1)(a) and 21 U.S.C. 846, possession of cocaine with intent to distribute and conspiracy to distribute cocaine, (2) that evidence of the commission of these criminal offenses will be found at the residences described in great detail above and (3) that the TARGET RESIDENCE is subject to forfeiture under 21 U.S.C. Section 853(a) and Section 881(a) because it constitutes or is derived from or is traceable to proceeds of drug trafficking crimes and/or it has been used or intended to be use to commit or facilitate the commission of drug trafficking crimes, and/or it is subject to forfeiture under 18 U.S.C. Section 918(a)(1)(A) and Section 982(a)(1) because it is property that has been involved in or is traceable to money laundering crimes.

23.     Therefore, I respectfully request that the court issue a warrant commanding the search of 11512 Ridge Oak Drive, Charlotte, NC 28273 and further issue an order and lis pendens to be recorded in the appropriate county records as public notice that the TARGET RESIDENCE is subject to forfeiture.


Rodney Pierce
Task Force Officer
Drug Enforcement Administration


SUBSCRIBED to and SWORN to before me on this _20th_ day of September, 2006


Carl Horn, III
United States Magistrate Judge

7